UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Cedric Eugene Green**, | Case No. 17cv1156 JAH (RBM) |
| Plaintiff, | **REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON EXHAUSTION GROUNDS (Doc. 71)** |
| v. | |
| **Dr. B. Thiessen et al.**, | |
| Defendants. | |

I.    INTRODUCTION

Plaintiff Cedric Eugene Green, an inmate currently incarcerated at California Men's Colony, has filed a 42 U.S.C. § 1983 lawsuit against a staff psychologist and two correctional officers at the RJ Donovan Correctional Facility for deliberate indifference to his health and safety in violation of the Eighth Amendment. (Doc. 1, at 2-3.) Defendants have filed a motion for summary judgment, arguing that Plaintiff has failed to exhaust his administrative remedies and that the evidence demonstrates

1

that Defendants have not violated Plaintiff's Eighth Amendment rights. (Doc. 71, at 18-25.) For the reasons discussed below, the Court recommends that the motion for summary judgment be granted because Plaintiff failed to exhaust his administrative remedies as to all claims in his Complaint.

## II.   ALLEGATIONS

Plaintiff claimed that the Defendants either prevented or denied medical care that resulted in deterioration of his mental health, causing him to attempt suicide. (Doc. 1.) On June 24, 2016, Plaintiff's mental health clinician and the supervising psychologist decided to admit him to the Mental Health Crises Bed Unit because he was suicidal. (Doc. 1, at ¶ 1.) While awaiting transfer to the Mental Health Crisis Bed Unit, Plaintiff attempted suicide by hanging. (Doc. 1, at ¶ 3.) The health care access officer allegedly sounded the alarm, causing all of the workers who were departing for the day to have to report back to the holding cell to help prevent Plaintiff from committing suicide. (Id.) Plaintiff claimed the unnamed responding officers used excessive force on him during this incident. (Doc. 1, at ¶¶ 4-5.)

On July 13, 2016, Plaintiff allegedly had "unfavorable" communications with the leader of a mental health treatment group, which resulted in the group leader asking Plaintiff to leave and caused a disruption in the mental health building. (Id. at ¶ 7.) Plaintiff claimed that despite this disruption, he was never cited with any rules violation. (Id.)

2

The next day, on July 14, 2016, Plaintiff agreed to attend the mental health treatment group again; however, Plaintiff's cell door wasn't opened during group release. (Id. at ¶ 8.) Defendant Lopez then informed him that Defendant Solis didn't want Plaintiff "over there anymore." (Id. at ¶ 8.) Soon afterwards, Plaintiff started to experience deteriorating mental stability. (Id. at ¶ 9.) Then, as Plaintiff's cellmate returned to the cell, Plaintiff exited his cell to let the building officers know his mental stability was declining and to request assistance from Dr. Thiessen. (Id. at ¶ 10.) Assuming Plaintiff was attempting to attend group therapy, the building control officer allegedly said over the loudspeaker, "They don't want you over there; you didn't behave yesterday." (Id.)

Plaintiff next alleged that Dr. Thiessen arrived at the housing unit, spoke with Plaintiff, and promised to return later to help ease Plaintiff's eroding mental stability. (Id. at ¶ 11.) Dr. Thiessen did return to the housing unit and consulted with Plaintiff a second time, but upon Dr. Thiessen's departure, Plaintiff felt fearful that he might commit suicide; to address this feeling, he exited the housing unit, caught up with Dr. Thiessen, and said in the presence of Dr. Thiessen and Defendant Lopez, "I'm feeling suicidal. I'm going to go back to my cell to cut my wrist with a razor." (Id. at ¶¶ 12-13.)

At that moment, as Dr. Thiessen was passing through the gate, Defendant Lopez allegedly told Plaintiff, "Okay, wait right there." (Id. at ¶ 14.) Then, Defendant Lopez went through the gate with Dr. Thiessen, went into the mental health building, and

3

left Plaintiff alone with the means to kill himself. (Id.) As Plaintiff stood at the gate waiting for help, he allegedly felt the overwhelming desire to die, so he returned to his cell and attempted suicide by cutting his wrist with a razor blade. (Id.) Plaintiff was discovered by building officers, who then applied pressure to Plaintiff's wound and sounded the alarm. (Id. at ¶ 15.) He was then sent to the Correctional Treatment Center where he received sutures, and he was later hospitalized. (Id. at ¶ 15.) Plaintiff suffered a wrist injury and extreme emotional distress. (Id. at ¶ 16.) Plaintiff claimed that based on Plaintiff's previous suicide attempt and his actions that day, Defendant Lopez had knowledge of and disregarded Plaintiff's serious medical need. (Id. at ¶ 20.) And Plaintiff claimed that Dr. Thiessen, despite knowing of Plaintiff's mental health condition and suicidal thoughts, "made a conscious decision to participate in the malicious campaign of harassment against Plaintiff by telling other CDCR employees that Plaintiff was being 'manipulative,' [which] led to Plaintiff being treated with deliberate indifference to a serious medical need." (Id. at ¶ 22.)

On July 31, 2016, Plaintiff allegedly submitted an administrative 602 appeal to RJ Donovan officials regarding "the refusal of access to health care on July 14, 2016." (Id. at ¶ 17.) However, Plaintiff claimed that his appeals have gone unacknowledged by RJ Donovan prison officials and that he has been the subject of an aggressive campaign of harassment by prison officials since the filing of the 602 appeal regarding the excessive force he was subjected to on June 24, 2016. (Id. at ¶ 18.)

4

## III. EVIDENCE PRESENTED

### A. Defendants' Proffer

Defendant Thiessen, a psychologist at RJ Donovan who specializes in treating suicidal inmates, declared that he did not refuse to provide Plaintiff with treatment on July 14, 2016, the day that Plaintiff slashed his wrist. (Thiessen Decl. ¶¶ 2-5, 7.) Rather, Dr. Thiessen immediately stopped what he was doing and went to meet with Plaintiff and consulted with the officer who had expressed concern over Plaintiff's behavior. (Thiessen Decl. ¶ 7.) Dr. Thiessen devoted most of the remaining work day to assessing, treating, and advocating for Plaintiff's safety and mental health needs. (Id.) Dr. Thiessen declared that his treatment of Plaintiff was proper, based on his training and Plaintiff's medical records. (Id.)

Dr. Thiessen met with Plaintiff on July 14, 2016 in the dayroom of the housing unit shortly after receiving word that Plaintiff was presenting a management issue in the building where he was housed. (Id. at ¶ 8.) Dr. Thiessen observed Plaintiff calmly sitting alone at the dayroom table and described him as being alert, cooperative, and demanding as they interacted. (Id. at ¶ 8.) Plaintiff expressed frustration to Dr. Thiessen with what he perceived as prison staff's refusal to allow him to attend his therapy group appointment. (Id. at ¶ 8.) Plaintiff demanded to know who decided he could not attend his morning group appointment, to talk to Senior Psychologist Dr. Breyer, and to be escorted to his group appointment; he told Dr. Thiessen that he would deteriorate if his demands weren't met. (Id. at ¶ 8.) Dr. Thiessen told Plaintiff

5

that he would check into Plaintiff's requests and get back to him. (Id. at ¶ 8.) Before leaving, Dr. Thiessen encouraged Plaintiff to remain calm until the issues he brought up were adequately addressed. (Id. at ¶ 8.) Dr. Thiessen informed Plaintiff that he would return once he had a sense of how to best address Plaintiff's concerns and to check on Plaintiff's mental health condition. (Id. at ¶ 8.) Dr. Thiessen believed that, based on his education, training, and experience, that Plaintiff was stable and not at risk of imminent suicide. (Id. at ¶ 15.)

Dr. Thiessen then spoke with various custody staff in the housing unit to gather information on Plaintiff and the incident that occurred the day before in group therapy. (Id. at ¶ 9.) Dr. Thiessen learned that Plaintiff interrupted group therapy the day before by making disruptive demands which led the group facilitator to request assistance of custody officers. (Id. at ¶ 9.) Dr. Thiessen also learned that Plaintiff's behavior persisted, taking the form of passive resistance to custody staff's commands to Plaintiff as they were attempting to de-escalate a potentially dangerous situation. (Id. at ¶ 9.)

Dr. Thiessen then returned to the medical health building to consult with Dr. Beyer, the Senior Psychiatric Supervisor. (Id. at ¶ 10.) Dr. Thiessen informed Dr. Beyer that Plaintiff denied having suicidal ideations and denied homicidal ideations, but that the situation was rather fluid. (Id. at ¶ 10.) Dr. Thiessen informed Dr. Beyer that Plaintiff was alert and orientated in person, place, time, and situation, and that he was cooperative but very demanding and manipulative, mildly depressed, highly

6

anxious, and agitated. (Id. at ¶ 10.) Dr. Thiessen told Dr. Beyer that his gait, grooming, and hygiene were normal; that there was no evidence of self-neglect; and that Plaintiff showed no sign that he was imminently suicidal. (Id. at ¶ 10.) Dr. Beyer and Dr. Thiessen agreed that Dr. Thiessen would see Plaintiff again and that he would continue to monitor his situation and report any changes to Dr. Beyer. (Id. at ¶ 10.)

Dr. Thiessen then returned to Plaintiff's housing unit to speak with him as promised. (Id. at ¶ 11.) When Dr. Thiessen entered the building, he noted a distinct odor and was informed that pepper spray had been released in the building. (Id. at ¶ 11.) Thinking he could tolerate it, Dr. Thiessen asked to see Plaintiff at a table in the dayroom, but he was soon overcome by the fumes when he started speaking with Plaintiff. (Id. at ¶ 11.) Dr. Thiessen informed Plaintiff that he was having trouble breathing and speaking and that he would need to come back a little later to check on his mental health status. (Id. at ¶¶ 11 and 15.) Although Dr. Thiessen was having difficulty breathing and speaking, Plaintiff nodded his head and seemed to acknowledge that he understood the situation; he did not say anything at the moment about having become suicidal. (Id. at ¶ 15.)

After Dr. Thiessen left the building and crossed the yard, Dr. Thiessen heard Plaintiff approaching him from across the yard and yelling something at him. (Id. at ¶ 11.) Dr. Thiessen felt threatened by Plaintiff, who was obviously upset, because he did not see anyone else on the yard. (Id. at ¶ 11.) The officer at the gate quickly opened the gate for Dr. Thiessen and stopped Plaintiff from going any further. (Id. ¶

7

11.) Dr. Thiessen then let Plaintiff and the officer at the gate know that he intended to have Plaintiff admitted to the Mental Health Crisis Bed Unit. (Id. at ¶ 12.) Dr. Thiessen declared that he then took immediate steps, per prison/mental health staff protocol, to ensure that Plaintiff was placed in the holding module, just inside the mental health building. (Id. at ¶ 12.) Although Dr. Thiessen declared that he followed the steps required of him to inform custody that he needed to be placed in the holding module, Dr. Thiessen declared that he did not know if Plaintiff ran away from the gate officer at that point. (Id. at ¶¶ 12–13.) While Dr. Thiessen was back in his office reviewing his records and preparing the paperwork for admitting Plaintiff to the Mental Health Crises Bed Unit, he received a call from Dr. Beyer informing him that Plaintiff had cut his wrist and was being transported to the Mental Health Crisis Bed Unit. (Id. at ¶ 13.) Dr. Thiessen then went immediately to the Mental Health Crisis Bed Unit, out of concern for Plaintiff. (Id. at ¶ 14.) Seeing Plaintiff standing in the holding module with a bandage around his wrist, Dr. Thiessen asked him what had happened. (Id. at ¶ 14.) Plaintiff replied, "I don't want to speak with you. You have an attitude." (Id. at ¶ 14.) Dr. Thiessen could tell by Plaintiff's verbal responses and body language that Plaintiff was determined to refuse treatment and to block Thiessen from any further efforts to engage him. (Id. at ¶ 14.) Dr. Thiessen reported Plaintiff's refusal to cooperate with his assessment to the receiving mental health staff at the Mental Health Crisis Bed Unit to ensure continuity, that is, to ensure that Plaintiff's mental health care could be continued without further interruption. (Id. at ¶ 14.)

8

Plaintiff was admitted to the Mental Health Crisis Bed Unit and placed on suicide watch. (Id. at ¶ 14.)

Defendant Lopez declared that he did not prevent Plaintiff from attending the July 14 therapy session and that he had no knowledge of any other correctional staff member doing so. (Lopez Decl. ¶ 5.) Defendant Lopez was working as an escort officer in Facility C in the Mental Health Building, Enhanced Outpatient Program (EOP), Building #3, at RJ Donovan on July 14, 2016. (Id. at ¶ 3.) Although he escorted inmates from their housing units to EOP Building #3, Lopez did not recall taking Plaintiff's ID card. (Id. at ¶¶ 3-4.) Defendant Lopez always immediately handed over an inmate's ID to the escorting officer responsible for medical appointments or to the other escorting officer responsible for one-on-one, individual psychiatric appointments. (Id. at ¶ 4.) Defendant Lopez believed that Plaintiff's ID was handed to another officer as his name is often confused with other officers' names. (Id.) In any event, Defendant Lopez did not tell Plaintiff that Defendant Solis did not want Plaintiff at the group therapy session. (Id. at ¶ 5.) Defendant Lopez did not prevent Plaintiff from attending the July 14 therapy session, and Lopez did not know of any other correctional staff member doing so. (Id. at ¶ 5.) Defendant Lopez declared that he was informed that Plaintiff voluntarily refused to attend the July 14, 2016 group therapy session. (Lopez Decl. ¶ 5; Asfour Decl. ¶ 3 and Exhibit A thereto.)

9

At one point on July 14, 2016, Defendant Lopez was at the mental health gate, where he would let inmates enter the yard after they had completed their medical or psychiatric evaluations so that they could return to their housing units. (Lopez Decl. ¶ 8.) On that day, Defendant Lopez noticed the entrance door of Housing Unit #14 open and several inmates and staff exiting. (Lopez Decl. ¶ 8.) Defendant Lopez waited at the gate for Dr. Thiessen, who arrived along with several inmates, including Plaintiff. (Lopez Decl. ¶ 8.) At that point, Plaintiff whispered something to Defendant Lopez, who remembered Plaintiff saying that he wanted to see a clinician and that he wanted to hurt himself. (Lopez Decl. ¶ 9.) Defendant Lopez told Plaintiff to wait until he let Dr. Thiessen and the other inmates through the gate and inside the mental health area first. (Lopez Decl. ¶ 9.) Defendant Lopez told Plaintiff to "wait right here," which is very typical when gate traffic is busy. (Lopez Decl. ¶ 9.) While Plaintiff remained next to the gate, Defendant Lopez let Dr. Thiessen and the other inmates through the chain-linked fence gate and locked it behind him. (Lopez Decl. ¶ 10.) Dr. Thiessen and the other inmates then walked to another gate and waited for Defendant Lopez to open the inner secured gate entrance to the mental health building. (Lopez Decl. ¶ 10.) After opening the inner security gate to let Dr. Thiessen and the other inmates inside the complex, Defendant Lopez immediately walked back to Plaintiff and asked him three times if he was going to be "OK" waiting there while he went to alert the mental health staff of his request to be seen by a clinician. (Lopez Decl. ¶ 10.) Plaintiff answered "yes" three times that he would be "OK." (Lopez Decl. ¶ 10.)

10

After checking to ensure that Plaintiff would be safe waiting at the gate, Defendant Lopez then went inside the main mental health building to inform the desk staff that Plaintiff was waiting at the gate wanting to see a clinician and wanting to hurt himself. (Lopez Decl. ¶ 11.) Dr. Thiessen was at the front desk area at the time, and he informed Lopez that he just interviewed Plaintiff in the housing unit. (Lopez Decl. ¶ 11.) It was determined shortly thereafter that Defendant Lopez would bring Plaintiff into the main EOP building for another interview with Dr. Thiessen. (Lopez Decl. ¶ 11.) Defendant Lopez then returned to the gate to retrieve Plaintiff, but Plaintiff was no longer standing there or waiting around in the general area. (Lopez Decl. ¶ 12.) Plaintiff had been waiting for only a few minutes from the time Defendant Lopez left him at the gate and the time he returned to the gate after speaking with Dr. Thiessen inside the mental health building. (Lopez Decl. ¶ 12.) Defendant Lopez later learned that Plaintiff had cut his wrist in his cell after leaving the gate where he had last spoken with Lopez. (Lopez Decl. ¶ 12.) Defendant Lopez never had any intention of denying him treatment or demonstrating malice or indifference to his request to see a clinician. (Lopez Decl. ¶ 13.) Defendant Lopez acted immediately and in conformance with prison policy and procedure when Plaintiff asked to see a clinician, and Defendant Lopez never took any action to prevent Plaintiff from attending any group therapy session. (Lopez Decl. ¶ 13.)

Defendant Solis was working as the Facility C EOP clinic officer on July 14, 2016. (Solis Decl. ¶ 2.) Defendant Solis never informed any correctional officer or

11

staff member, including Correctional Officer Lopez and Dr. Thiessen, that Plaintiff was not wanted at the group therapy session. (Solis Decl. ¶ 2.) Plaintiff's evidence that Defendant Solis said that Plaintiff was not wanted at the July 14, 2016 group therapy is based on inadmissible hearsay. (Pl's Dep. at 19:9–20:5; 33:4–34:22.) Defendant Solis never told Dr. Thiessen that inmate Green was not wanted at the July 14 group therapy session because of the way he acted at the July 13 session (Solis Decl. ¶ 2), and Dr. Thiessen never told inmate Green that Defendant Solis said this to him (Thiessen Decl. ¶ 17).

Plaintiff is not suing for retaliation as to any Defendant. (Pl's Dep. at 47:12–48:3.) For the claims that Plaintiff did state in his Complaint, he did not exhaust his administrative remedies. (Self Decl. ¶¶ 5–9; Voong Decl. ¶¶ 7–10; Gates Decl. ¶¶ 1–9.) Plaintiff mailed his inmate appeal to the warden's office, which is not the proper place of filing. (Self. Decl. ¶ 9; Pl.'s Dep. 51:5–52:17.) The warden's office would have forwarded the appeal to the appeals coordinator's office, but there were no appeals located concerning the allegations in the Complaint. (Self Decl. ¶ 9.) Plaintiff filed an appeal for events that happened on July 14, 2016, after Plaintiff was placed in a therapeutic holding cell, but those allegations are against other RJD staff members, specifically Correctional Officers Lucero and Beltran, and for entirely different allegations than those in the Complaint. (Self Decl. ¶¶ 7–8 and Exhibit A; Voong Decl. ¶¶ 9–10 and Exhibit A.) Plaintiff did not file a health care appeal with the Health Care Correspondence and Appeals Branch for events that happened on

12

July 14, 2016. (Gates Decl. ¶¶ 1–9.) Plaintiff filed other health care appeals in 2016 and 2017 through the first and second levels of review, including one appeal through the third level of review, but none of those appeals are with regard to Defendant Thiessen denying Plaintiff needed mental health treatment. (Gates Decl. ¶ 8 and Exhibit A.)

**B. Plaintiff's Proffer**

On July 14, 2016, as a participant of the Enhanced Outpatient Program (EOP), Plaintiff was housed at RJ Donovan Correctional Facility, Facility C, Housing Unit #14, Cell 103. (Green Decl. ¶ 2.) On July 14, 2016, Plaintiff was an inmate-patient of Dr. Thiessen. (Green Decl. ¶ 3.) Plaintiff declared that Dr. Thiessen became his primary clinician upon his return to Facility C from the Mental Health Crises Bed Unit after he was admitted for attempting suicide on June 24, 2016. (Green Decl. ¶ 3.) Prior to the July 14, 2016 incident, Plaintiff met with Dr. Thiessen to develop his mental health treatment plan which was to be presented to the interdisciplinary treatment team on July 14, 2016. (Green Decl. ¶ 4.) In his treatment plan, Dr. Thiessen indicated the following risk factors/behavioral alerts: (A) self-injurious behavior, (B) history of suicidal ideation, and (C) suicide attempts. (Green Decl. ¶ 5.) Dr. Thiessen's clinical summary included, in part, a note of his previous documented suicide attempts including two attempts by wrist cutting. (Green Decl. ¶ 5.) Dr. Thiessen noted that Plaintiff suffered from schizoaffective disorder and chronic depression with fleeting suicidal ideation. (Green Decl. ¶ 5.)

13

Plaintiff declared that he did not recall being offered an opportunity to attend the interdisciplinary treatment team meeting on July 14, 2016. (Green Decl. ¶ 7.) Plaintiff declared that he did not communicate with the recreational therapist A. Asfour on July 14, 2016 prior to his 1130 hours appointment at EOP Building #3 that was to be facilitated by A. Asfour. (Green Decl. ¶ 7.) On July 14, 2016, Defendant Lopez approached Plaintiff's assigned cell and asked him if he would be attending his 1130 hours appointment. (Green Decl. ¶ 9.) Plaintiff agreed to attend and handed Defendant Lopez his ID card. (Green Decl. ¶ 9.) Shortly thereafter, Defendant Lopez returned to Plaintiff's cell, gave him his ID card, and said that he could not attend his 1130 hours appointment at EOP building #3 because Defendant Solis did not want him in the mental health buildings. (Green Decl. ¶ 10.) At that time, Plaintiff began to experience active suicidal ideation and started to look around his cell for a way to commit suicide. (Green Decl. ¶ 11.) At approximately 1135 hours, as his cellmate returned to his cell, Plaintiff exited his cell through the opened cell door and approached the housing unit officers to request mental health assistance. (Green Decl. ¶ 12.) The control officer, R. Briones, then told Plaintiff multiple times to return to his cell and stated through the public address system, "They don't want you over there. You didn't behave yesterday." (Green Decl. ¶ 12.) Nevertheless, when the housing unit officers arrived, Plaintiff assumed a passive, non-threatening seated position and requested to speak with Thiessen. (Green Decl. ¶ 13.) Plaintiff declared that the housing unit officers did not consider him a threat to the safety and security

14

of the institution and allowed him to remain in the housing unit dayroom, seated at a table to await for Thiessen's arrival. (Green Decl. ¶ 14.) Upon Thiessen's arrival, Plaintiff agreed to his assessment and concluded that the situation was stressful but that he was not going to immediately return to his cell and attempt suicide. (Green Decl. ¶ 15.) However, Plaintiff clearly expressed to Dr. Thiessen that his mental health stability could further deteriorate. (Green Decl. ¶ 15.) In an attempt to problem solve, Dr. Thiessen and Plaintiff identified stressors causing the worsening of mental health symptoms and came up with three suggested solutions. (Green Decl. ¶ 15.) Plaintiff agreed to attempt stress management through patience and to wait as Thiessen investigated the situation. (Green Decl. ¶ 16.) Thiessen assured Plaintiff that he would return to the housing unit to follow up with him. (Green Decl. ¶ 16.) At that point, the housing unit officers allowed him to remain seated in the housing unit dayroom. (Green Decl. ¶ 17.) Having waited for about an hour and a half, Plaintiff asked the housing unit officers to call Thiessen to inquire about his follow-up return. (Green Decl. ¶ 17.) Shortly thereafter, Thiessen returned to the housing unit but there was pepper spray fumes in the air. (Green Decl. ¶ 18.) At that point, Thiessen told Plaintiff that Solis did not want him in the mental health buildings but then left the housing unit immediately because he was unable to bear the pepper spray fumes. (Green Decl. ¶ 19.) At no time did Thiessen communicate to Plaintiff that he would return to the housing unit for a third time. (Green Decl. ¶ 19.) At that point, Plaintiff began to experience active suicidal ideation again and had thoughts of

15

cutting his wrists with a razor that he found earlier. (Green Decl. ¶ 20.) However, Plaintiff decided against immediately attempting suicide and chose to seek help. (Green Decl. ¶ 20.) Plaintiff then exited the housing unit and pursued Thiessen. (Green Decl. ¶ 21.) When he caught up with him, Thiessen was being keyed though the outer security gate by Defendant Lopez. (Green Decl. ¶ 21.) Plaintiff then expressed that he intended to return to his cell and attempt suicide by cutting his wrist with a razor; his statement was meant to be heard and taken seriously by Thiessen and Lopez. (Green Decl. ¶ 22.) Plaintiff declared that he understood that if Lopez and Thiessen complied with policy, then he would have been placed in handcuffs at the gate. (Green Decl. ¶ 22.) However, Plaintiff declared that at no time on July 14, 2016 while at the gate did Thiessen or Lopez tell Plaintiff that they intended to have him admitted to the Mental Health Crisis Bed Unit. (Green Decl. ¶ 23.) Plaintiff declared that at no time on July 14, 2016 did he ever ask Defendant Lopez to speak with a clinician, including at the mental health gate where his primary clinician was also present. (Green Decl. ¶ 24.) Plaintiff declared that at no time did Defendant Lopez ask him if he would be "okay" if he left him at the gate; Defendant Lopez simply instructed Plaintiff to "wait right there." (Green Decl. ¶ 25.) Plaintiff then waited for 25 minutes at the gate; however, when the desire to die became overwhelming, he returned to his cell and attempted suicide by cutting his wrist with a razor. (Green Decl. ¶ 26.) When Plaintiff was discovered by housing unit officers, a correctional officer had to apply pressure with his hand on Plaintiff's wound until medical staff

16

arrived on the scene. (Green Decl. ¶ 27.) Plaintiff received three stitches to close the wound on his wrist and was later transported to Sharp Memorial Hospital for further treatment. (Green Decl. ¶ 27.)

On July 28, 2016, Plaintiff signed and dated a CDCR 602 appeal with regard to the July 14, 2016 incident involving Defendants Thiessen, Lopez, and Solis. (Green Decl. ¶ 28.) However, because the designated 602 drop box located inside housing unit 14 was damaged, Plaintiff was forced to exercise an alternative way to submit the 602 appeal. (Green Decl. ¶ 28; <u>see</u> Doc. 80, at 140.) Plaintiff addressed a postage-paid envelope to Warden Daniel Paramo and presented the envelope and the 602 appeal to Correctional Officer R. Briones for processing, which Briones processed. (Green Decl. ¶ 29.) Afterwards, on July 28, 2016, Plaintiff completed a CDCR 22 inmate request form to confirm when the confidential mail he sent to the warden arrived in the mailroom for processing. (Green Decl. ¶ 29; <u>see</u> Doc. 80, at 60.) In response to the July 28, 2016 CDCR 22 request, the RJ Donovan mailroom sent him a print out of his legal log dated July 29, 2016. (Green Decl. ¶ 30.) Plaintiff declared that "neither the CDCR 22 or the legal log confirmed the confidential mail to Warden Paramo." (Green Decl. ¶ 30.) Plaintiff then resubmitted the CDCR 22 again asking for confirmation, and the RJ Donovan mailroom referred him to "Esmeralda de la Vega" of the RJ Donovan's Warden's Office. (Green Decl. ¶ 30.)

On August 11, 2016, Plaintiff submitted a separate 602 appeal, RJD-16-3530, regarding a separate issue. (Green Decl. ¶ 31.) On August 30, 2016, after not

17

receiving any inmate appeals notice regarding the July 28, 2016 and August 11, 2016 confidential mail submissions, Plaintiff wrote a letter to Warden Paramo describing the two 602s and a possible compromised mail system. (Green Decl. ¶ 32.) On September 25, 2016, Plaintiff submitted a 602 appeal, # RJD-16-04433, with regard to the two 602s mailed confidentially to Warden Paramo which had not been introduced into the inmate appeals system. (Green Decl. ¶ 33; <u>see</u> Doc. 80, at 68, 70.) On October 26, 2016, RJ Donovan officials rejected this "appeal" because he had to use the CDCR 22 process to inquire about appeals. (Green Decl. ¶ 34.) At the second level of review, the warden responded that there was no record of an appeal regarding refusal of access to healthcare at the RJD Inmate Appeals Office. (Doc. 80, at 84.) The third level of review found the same. (Doc. 80, at 86.) On February 4, 2017, Plaintiff wrote to the Office of the Inspector General (OIG) about the missing July 28, 2016 appeal. (Green Decl. ¶ 37.) Ultimately, the OIG declined to intervene. (Green Decl. ¶ 37.) The OIG advised Plaintiff to resubmit his original appeals to the appeals office. (Doc. 80, at 90.) Plaintiff declared that his "every attempt to introduce the issues of this civil action into the administrative appeals system were obstructed, obfuscated, and rebuffed by prison officials, leaving [him] with no available administrative remedy." (Green Decl. ¶ 39.)

## IV.  STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and

18

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for the granting of a directed verdict. Judgment must be entered, "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "If reasonable minds could differ," however, judgment should not be entered in favor of the moving party. Id. at 250-51.

The parties bear the same substantive burden of proof as would apply at a trial on the merits, including plaintiff's burden to establish any element essential to his case. Liberty Lobby, 477 U.S. at 252. The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence, which the moving party "believes demonstrate the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The burden then shifts to the non-moving party to establish, beyond the pleadings, that there is a genuine issue for trial. See Celotex, 477 U.S. at 324. To

19

successfully rebut a properly supported motion for summary judgment, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff['s] favor, could convince a reasonable jury to find for the plaintiff[]." Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000).

While the district court is "not required to comb the record to find some reason to deny a motion for summary judgment," Forsberg v. Pacific N.W. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988), the court may nevertheless exercise its discretion "in appropriate circumstances," to consider materials in the record which are on file but not "specifically referred to." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). However, the court need not "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could be conveniently found." Id.

In ruling on a motion for summary judgment, the court need not accept legal conclusions "in the form of factual allegations." Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981). "No valid interest is served by withholding summary judgment on a complaint that wraps nonactionable conduct in a jacket woven of legal conclusions and hyperbole." Vigliotto v. Terry, 873 F.2d 1201, 1203 (9th Cir. 1989). Moreover, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material

20

fact." F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997). While "the district court may not disregard a piece of evidence at the summary stage solely based on its self-serving nature," Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 497-498 (9th Cir. 2015) (finding plaintiff's "uncorroborated and self-serving declaration sufficient to establish a genuine issue of material fact because the "testimony was based on personal knowledge, legally relevant, and internally consistent"), "[t]he district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." Id. at 497 (citations omitted). "[T]he court must consider whether the evidence presented in the affidavits is of sufficient caliber and quantity to support a jury verdict for the nonmovant. A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." United Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (citations omitted).

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). "We have repeatedly held that unauthorized documents cannot be considered in a motion for summary judgment." Id. "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56." Block v. City of Los Angeles, 253 F.3d 410, 418-419 (9th Cir. 2001).

V.  DISCUSSION

In their summary judgment motion, Defendants argue that the evidence shows that Dr. Thiessen and correctional officers Lopez and Solis did not violate Plaintiff's Eighth Amendment right to be free from deliberate indifference to his serious medical needs on July 14, 2016. (Doc. 71-1, at 18.) Defendants also argue that Plaintiff failed to exhaust the prison's administrative remedies for the claims in the Complaint. (Id. at 21-25.) Plaintiff has opposed all parts of Defendants' motion and has submitted his own evidence establishing that there are triable issues of fact in his case. (Doc. 80.) Having considered the pleadings, the motion briefings, and all of the submitted evidence, the Court makes the following findings and recommendations:

**A. Defendants are entitled to summary judgment as to Plaintiff's Eighth Amendment claim against Defendant Solis.**

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
>
> 42 U.S.C. § 1983.

The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423

22

U.S. 362 (1976). A person subjects another to the deprivation of a constitutional right, within the meaning of § 1983, "if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson v. Seiter, 501 U.S. 294, 298-99 (1991). To prevail on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must show that: (1) he had a serious medical need; and (2) the defendant's response to the need was deliberately indifferent. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976). To establish a serious medical need, the plaintiff must show that the "failure to treat [the] ... condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett, 439 F.3d at 1096 (citation omitted). "The existence of an injury that a reasonable

23

doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

For a prison official's response to a serious medical need to be deliberately indifferent, the official must "'know[ ] of and disregard[ ] an excessive risk to inmate health.'" Peralta v. Dillard, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting Farmer, 511 U.S. at 837). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Wilhelm, 680 F.3d at 1122. Deliberate indifference may be found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for] medical treatment." Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002).

Here, Defendant Solis admitted that he was working as the Facility C EOP clinic officer on July 14, 2016, the day that Plaintiff slashed his wrist in an attempted

24

suicide; however, Defendant Solis declared that he never informed any correctional officer or staff member, including Correctional Officer Lopez and Dr. Thiessen, that Plaintiff was not wanted at the July 14 group therapy session. (Solis Decl. ¶ 2.) Defendant Solis never told Dr. Thiessen that inmate Green was not wanted at the July 14 group therapy session because of the way he acted at the July 13 session (Solis Decl. ¶ 2), and Dr. Thiessen never told inmate Green that Defendant Solis said this to him (Thiessen Decl. ¶ 17). And Defendant Lopez declared that he did not tell Plaintiff that Defendant Solis did not want him at the group therapy session. (Lopez Decl. at ¶ 5.) On the other hand, Plaintiff alleged that he was informed by Defendant Lopez that Defendant Solis did not want Plaintiff to attend his mental health group therapy session "anymore," including the one scheduled for 1130 hours on July 14, 2016, and that, as a result, he started to experience deteriorating mental stability, which led to his attempted suicide. (Doc. 1, at ¶¶ 8-9.) In support of his allegation, Plaintiff submitted a declaration stating that Defendant Lopez said that he could not attend his 1130 hours appointment at EOP building #3 because Defendant Solis did not want him in the mental health buildings. (Green Decl. ¶ 10.)

Nevertheless, as the only evidence that Plaintiff has presented contradicting Defendants' admissible evidence is based on inadmissible hearsay, (see Pl's Dep. at 19:9–20:5; 33:4–34:22), the Court finds that Plaintiff has failed to present any evidence of sufficient caliber or quantity to support a jury verdict in his favor that Defendant Solis was deliberately indifferent to his mental health issues in violation

25

of the Eighth Amendment. Thus, based on the evidence submitted by the Defendants, the Court recommends that Defendants' motion for summary judgment as to the Eighth Amendment claim against Defendant Solis be granted.

**B. Plaintiff has established that there are triable issues of fact regarding the Eighth Amendment claims against Defendants Thiessen and Lopez.**

In Defendants' motion for summary judgment, Defendants Thiessen and Lopez have also submitted evidence that they did not violate Plaintiff's Eighth Amendment rights. However, unlike the lack of admissible evidence against Defendant Solis, Plaintiff has presented enough evidence that could support a jury verdict that Defendants Thiessen and Lopez were deliberately indifferent to Plaintiff's serious mental health needs.

**Dr. Thiessen**

Dr. Thiessen submitted a declaration stating that he did not refuse to provide Plaintiff with treatment on July 14, 2016, the day that Plaintiff slashed his wrist. (Thiessen Decl. ¶ 7.) Dr. Thiessen met with Plaintiff on July 14, 2016 in the dayroom of the housing unit shortly after receiving word that Plaintiff had issues that needed to be addressed. (Id. at ¶ 8.) Dr. Thiessen assured Plaintiff that he would check into Plaintiff's requests and get back to him. (Id. at ¶ 8.) Before leaving, Dr. Thiessen encouraged Plaintiff to remain calm until the issues he brought up were adequately addressed. (Id. at ¶ 8.)

26

After speaking with custody staff and to Dr. Beyer to address Plaintiff's concerns, Dr. Thiessen then returned to Plaintiff's housing unit to speak with him as promised. (Id. at ¶ 11.) When Dr. Thiessen entered the building, he noted a distinct odor and was informed that pepper spray had been released in the building. (Id. at ¶ 11.) Thinking he could tolerate it, Dr. Thiessen asked to see Plaintiff at a table in the dayroom, but he was soon overcome by the fumes when he started speaking with Plaintiff. (Id. at ¶ 11.) Dr. Thiessen informed Plaintiff that he was having trouble breathing and speaking and that he would need to come back a little later to check on his mental health status. (Id. at ¶¶ 11 and 15.) Although Dr. Thiessen was having difficulty breathing and speaking, Plaintiff nodded his head and seemed to acknowledge that he understood the situation; he did not say anything at the moment about having become suicidal. (Id. at ¶ 15.)

After Dr. Thiessen left the building and crossed the yard, Dr. Thiessen heard Plaintiff approaching him from across the yard and yelling something at him. (Id. at ¶ 11.) Dr. Thiessen felt threatened by Plaintiff, who was obviously upset, because he did not see anyone else on the yard. (Id. at ¶ 11.) The officer at the gate quickly opened the gate for Dr. Thiessen and stopped Plaintiff from going any further. (Id. ¶ 11.) Dr. Thiessen then let Plaintiff and the officer at the gate know that he intended to have Plaintiff admitted to the Mental Health Crisis Bed Unit. (Id. at ¶ 12.) Dr. Thiessen declared that he then took immediate steps, per prison/mental health staff protocol, to ensure that Plaintiff was placed in the holding module, just inside the

27

mental health building. (Id. at ¶ 12.) Although Dr. Thiessen declared that he followed the steps required of him to inform custody that he needed to be placed in the holding module, Dr. Thiessen declared that he did not know if Plaintiff ran away from the gate officer at that point. (Id. at ¶¶ 12–13.) While Dr. Thiessen was back in his office reviewing his records and preparing the paperwork for admitting Plaintiff to the Mental Health Crises Bed Unit, he received a call from Dr. Beyer informing him that Plaintiff had cut his wrist and was being transported to the Mental Health Crisis Bed Unit. (Id. at ¶ 13.)

In Plaintiff's version of the July 14, 2016 incident, Plaintiff declared that Dr. Thiessen arrived at the housing unit, spoke with Plaintiff, and promised to return later to help ease Plaintiff's eroding mental stability. (Green Decl. ¶¶ 15-16.) Dr. Thiessen did return to the housing unit and consulted with Plaintiff a second time, but upon Dr. Thiessen's departure due to pepper spray fumes, Plaintiff felt fearful that he might commit suicide; as a result, he exited the housing unit, caught up with Dr. Thiessen, and said in the presence of Dr. Thiessen and Defendant Lopez that he intended to go back to his cell to cut himself with a razor. (Green Decl. ¶¶ 18-22.) At that moment, as Dr. Thiessen was passing through the gate, Defendant Lopez told Plaintiff to "wait right there." (Green Decl. ¶ 25.) As Plaintiff stood at the gate waiting for help, he felt the overwhelming desire to die, so he returned to his cell and attempted suicide by cutting his wrist with a razor blade. (Green Decl. ¶ 26.)

///

**Correctional Officer Lopez**

According to Defendant Lopez, he did not prevent Plaintiff from attending the July 14 therapy session and he had no knowledge of any other correctional staff member doing so. (Lopez Decl. ¶ 5.) Defendant Lopez was working as an escort officer in Facility C in the mental health building, Enhanced Outpatient Program (EOP), at RJ Donovan on July 14, 2016. (Lopez Decl. ¶ 3.) At one point on July 14, 2016, Defendant Lopez was at the mental health gate, where he would let inmates enter the yard after they had completed their medical or psychiatric evaluations so that they could return to their housing units. (Lopez Decl. ¶ 8.) On that day, Defendant Lopez noticed the entrance door of housing unit #14 open and several inmates and staff exiting. (Lopez Decl. ¶ 8.) Defendant Lopez waited at the gate for Dr. Thiessen, who arrived along with several inmates, including Plaintiff. (Lopez Decl. ¶ 8.) At that point, Plaintiff whispered something to Defendant Lopez, who remembers Plaintiff saying that he wanted to see a clinician and that he wanted to hurt himself. (Lopez Decl. ¶ 9.) Defendant Lopez told Plaintiff to wait until he let Dr. Thiessen and the other inmates through the gate and inside the mental health area first. (Lopez Decl. ¶ 9.) Defendant Lopez told Plaintiff to "wait right here," which is very typical when gate traffic is busy. (Lopez Decl. ¶ 9.) While Plaintiff remained next to the gate, Defendant Lopez let Dr. Thiessen and the other inmates through the chain-linked fence gate and locked it behind him. (Lopez Decl. ¶ 10.) Dr. Thiessen and the other inmates then walked to another gate and waited for Defendant Lopez

29

to open the inner secured gate entrance to the mental health building. (Lopez Decl. ¶ 10.) After opening the inner security gate to let Dr. Thiessen and the other inmates inside the complex, Defendant Lopez immediately walked back to Plaintiff and asked him three times if he was going to be "OK" waiting there while he went to alert the mental health staff of his request to be seen by a clinician. (Lopez Decl. ¶ 10.) Plaintiff answered "yes" three times that he would be "OK." (Lopez Decl. ¶ 10.) After checking to ensure that Plaintiff would be safe waiting at the gate, Defendant Lopez then went inside the main mental health building to inform the desk staff that Plaintiff was waiting at the gate wanting to see a clinician and wanting to hurt himself. (Lopez Decl. ¶ 11.) Dr. Thiessen was at the front desk area at the time, and he informed Lopez that he just interviewed Plaintiff in the housing unit. (Lopez Decl. ¶ 11.) It was determined shortly thereafter that Defendant Lopez would bring Plaintiff into the main EOP building for another interview with Dr. Thiessen. (Lopez Decl. ¶ 11.) Defendant Lopez then returned to the gate to retrieve Plaintiff, but Plaintiff was no longer standing there or waiting around in the general area. (Lopez Decl. ¶ 12.) Plaintiff would have been waiting for only a few minutes from the time Defendant Lopez left him at the gate and the time he returned to the gate after speaking with Dr. Thiessen inside the mental health building. (Lopez Decl. ¶ 12.) Defendant Lopez later learned that Plaintiff cut his wrist in his cell after leaving the gate where he had last spoken with Lopez. (Lopez Decl. ¶ 12.) Defendant Lopez declared that he acted

30

immediately and in conformance with prison policy and procedure when Plaintiff asked to see a clinician. (Lopez Decl. ¶ 13.)

In Plaintiff's version of the July 14, 2016 incident, Plaintiff expressed to both Defendant Thiessen and Defendant Lopez at the security gate that he intended to return to his cell and attempt suicide by cutting his wrist with a razor; Plaintiff declared that his statement was meant to be heard and taken seriously by Thiessen and Lopez. (Green Decl. ¶¶ 21-22.) Plaintiff understood that if Lopez and Thiessen complied with policy, then he would have been placed in handcuffs at the gate at that moment. (Green Decl. ¶ 22.) However, Plaintiff declared that at no time on July 14, 2016 while at the gate did Thiessen or Lopez tell Plaintiff that they intended to have him admitted to the mental health unit. (Green Decl. ¶ 23.) Plaintiff declared that at no time on July 14, 2016 did he ever ask Defendant Lopez to speak with a clinician, including at the mental health gate where his primary clinician was also present. (Green Decl. ¶ 24.) Plaintiff declared that at no time did Defendant Lopez ask him if he would be "okay" if he left him at the gate; Defendant Lopez simply instructed Plaintiff to "wait right there." (Green Decl. ¶ 25.) Plaintiff then waited for 25 minutes at the gate; however, when the desire to die became overwhelming, he returned to his cell and attempted suicide by cutting his wrist with a razor. (Green Decl. ¶ 26.)

**Analysis**

Having considered Thiessen's, Lopez's, and Plaintiff's versions of the events that transpired on July 14, 2016, the Court finds that there are triable issues of fact as

31

to whether Dr. Thiessen and Correctional Officer Lopez disregarded prison/mental health staff protocol by not ensuring that Plaintiff was placed in a holding module after they learned that Plaintiff was threatening immediate suicide. Dr. Thiessen admitted that he would have failed to comply with his duty of care if he had not ensured Plaintiff's safety by placing him under suicide watch in a holding module; yet, he did not provide details on how he "ensured" that Plaintiff was placed in a holding module, and he admitted that he did not know how Plaintiff was able to return to his cell to attempt suicide. Curiously, Defendant Lopez's version of events did not coincide with Defendant Thiessen's version of events, as he declared that Plaintiff was not placed in a holding module but was merely left at the gate to await Defendant Lopez's return from the mental health building. And Plaintiff declared that he did not ask Defendant Lopez to see a clinician but simply communicated that he was about to commit suicide, with the expectation that he would be handcuffed in order to stop him from doing so. Thus, the Court determines that findings of fact must be made as to whether Dr. Thiessen was deliberately derelict in his duty to prevent Plaintiff from attempting suicide by ensuring his placement in a holding module as required by prison protocol. Likewise, the Court determines that findings of fact must be made as to whether Defendant Lopez shirked his duties and deliberately failed to restrain Plaintiff after he verbalized his suicidal state to him. As such, Defendants motion for summary judgment Plaintiff's Eighth Amendment claims against Defendants Thiessen and Lopez should be denied.

32

## C. Plaintiff Failed to Properly Exhaust His Administrative Remedies.

Section 1997e(a) of the Prison Litigation Reform Act (PLRA) requires prisoners to exhaust all available administrative remedies before filing a § 1983 action in federal court. See 42 U.S.C. § 1997e(a). Congress enacted the PLRA in part to "allow prison officials a chance to resolve disputes regarding the exercise of their responsibilities before being hailed into court; to reduce the number of prison suits; and to improve the quality of suits that are filed by producing a useful administrative record." Garcia v. Miller, 2015 WL 5794552, at *4 (S.D. Cal. Oct. 2, 2015). With the passage of the PLRA, the exhaustion requirement was strengthened – it is "no longer left to the discretion of the district court, but is mandatory." Woodford v. Ngo, 548 U.S. 81, 85 (2006); Ross v. Blake, 136 S. Ct. 1850, 1857 ("[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion."). "The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.' Once that is no longer the case, then there are no 'remedies ... available,' and the prisoner need not further pursue the grievance." Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) (quoting Booth v. Churner, 532 U.S. 731, 739-41 (2001)). "Failure to exhaust is fatal to a prisoner's claim." Bush v. Baca, 2010 WL 4718512, at *3 (C.D. Cal. Sept. 3, 2010).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford, 548 U.S. at 90. "The relevant rules governing exhaustion are not defined by the PLRA, 'but by the prison grievance process itself.'"

33

Ayala v. Fermon, 2017 WL 836193, at *5 (S.D. Cal. March 2, 2017) (quoting Jones v. Block, 549 U.S. 199, 219 (2007)). Over the years, the CDCR has prescribed different sets of procedures for the administrative exhaustion of prisoners' health care complaints. Karas v. Marciano, 2017 WL 6816858, at *3 (C.D. Cal. November 13, 2017). The set of procedures that were applicable between January 28, 2011 and August 31, 2017 involved three steps. Under these procedures, "[p]risoners [were] required to submit appeals within 30 calendar days of the event being appealed . . . ." Gary v. Romero, 2017 WL 220238, at *5 (E.D. Cal. Jan. 18, 2017); see Cal. Code Regs., tit. 15 § 3084.8(b) (2011). These procedures directed the prisoner to submit "[f]irst and second level appeals" to the appeals coordinator at the institution or parole region . . . ." Cal. Code Regs., tit. 15 § 3084.2(c) (2011). The prisoner was required to "list all staff member(s) involved and . . . describe their involvement in the issue," stating "the staff member's last name, first initial, title or position." Id. at § 3084.2(a)(3) (2011). These procedures required that, when an appeal was not accepted, the prisoner "be notified of the specific reason(s) for the rejection or cancellation of the appeal and of the correction(s) needed for the rejected appeal to be accepted." Id. at § 3084.5(b)(3). At the third level of review, medical appeals were processed by the Office of Third Level Appeals for the California Correctional Health Care Services. Gray v. Romero, 2017 WL 220238, at *5-6 (E.D. Cal. Jan. 18, 2017).

34

In contrast, the updated set of procedures, applicable to health care complaints originating on or after September 1, 2017, involve only two steps. Cal. Code Regs., tit. 15, §§ 3087.2–3087.12 (2017). The first step requires the submission of a "602" form where the prisoner is housed within 30 calendar days of the incident. Id. at § 3087.2(b). If dissatisfied with the response of the institution where the prisoner is housed, the prisoner would then appeal by mailing a "health care grievance package" to the Health Care Correspondence and Appeals Branch of the CDCR. Id. at §§ 3087.4–3087.5.

If a prisoner fails to exhaust his remedies under either set of procedures, "[a] federal court may nonetheless excuse a prisoner's failure to exhaust if the prisoner takes 'reasonable and appropriate steps' to exhaust administrative remedies but prison officials render administrative relief 'effectively unavailable.'" Ellis v. Navarro, 2011 WL 845902, at *1 (N.D. Cal. March 8, 2011) (citation omitted). The mandatory exhaustion requirement under the PLRA is excused in three circumstances: (1) when an administrative procedure "operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use"; and (3) when "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1853-54.

The issue of "[e]xhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." Albino v. Baca, 747 F.3d 1162, 1170 (9th Cir. 2014) (en banc). In a summary judgment motion for failure to exhaust, the Ninth Circuit instructs that it is defendant's burden to "prove that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino, 747 F.3d at 1172. "Once the defendant has carried that burden, the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Id. "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56." Id. at 1179. However, "[i]f material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." Id. at 1166. "[F]actual questions relevant to exhaustion should be decided by the judge, in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue." Id. at 1170-71. "If 'summary judgment is not appropriate,' as to the issue of exhaustion, 'the district judge may decide disputed questions of fact in a preliminary proceeding.'" Hamilton v. Hart, 2016 WL 1090109, at *4 (E.D. Cal. March 21, 2016) (quoting Albino, 474 F.3d at 1168). "[W]hile parties may be expected to simply reiterate their positions as stated in their briefs, 'one of the purposes of an evidentiary hearing is to enable [] the

36

finder of fact to see the witness's physical reactions to the questions, to assess the witness's demeanor, and to hear the tone of the witness's voice.'" Hamilton, 2016 WL 1090109, at *4 (quoting U.S. v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995)). "All of this assists the finder of fact in evaluating the witness' credibility." Hamilton, 2016 WL 1090109, *4. "It is only in rare instances that credibility may be determined without an evidentiary hearing." Id. (internal citations and quotations omitted).

Here, Defendants have put forth evidence showing that Plaintiff has never submitted an appeal for the specific allegations and the specific Defendants in this case. Although Plaintiff filed a 602 appeal for events that happened on July 14, 2016, the allegations in that appeal were against other RJD staff members, specifically Correctional Officers Lucero and Beltran, and for entirely different allegations than those in the Complaint. (Self Decl. ¶¶ 7–8 and Exhibit A; Voong Decl. ¶¶ 9–10 and Exhibit A.) Likewise, the prison confirmed that Plaintiff did not file a health care appeal with the Health Care Correspondence and Appeals Branch for events that happened on July 14, 2016. (Gates Decl. ¶¶ 1–9.) Plaintiff filed other health care appeals that were received and processed in 2016 and 2017 through the first and second levels of review, including one appeal through the third level of review, but none of those appeals are with regard to Defendant Thiessen denying Plaintiff needed mental health treatment. (Gates Decl. ¶ 8 and Exhibit A.)

Although Plaintiff declared that he signed and dated a CDCR 602 appeal on July 28, 2016 regarding the July 14, 2016 incident involving Defendants Thiessen,

37

Lopez, and Solis, he stated that he sent the appeal in a postage-paid envelope to the warden because the in-house appeals box in his housing unit was damaged. (Green Decl. ¶¶ 28-29.) Sending the appeal to the warden was not the proper procedure for submitting a 602 appeal, and Plaintiff did not give a reason why he could not address the postage-paid envelope to the appeals coordinator as required by the procedural rules. (Pl.'s Dep. 51:5–52:17.) In any event, the warden's office would have forwarded any appeal to the appeals coordinator's office, but there were no appeals received concerning the allegations in Plaintiff's Complaint. (Self Decl. ¶ 9.) On July 28, 2016, Plaintiff did make attempts to seek confirmation that his 602 appeal was received by completing a CDCR 22 inmate request form. (Green Decl. ¶ 29; see Doc. 80, at 60.) In response to the July 28, 2016 CDCR 22 request, the RJ Donovan mailroom sent him a print out of his legal log dated July 29, 2016. (Green Decl. ¶ 30.) Plaintiff declared that "neither the CDCR 22 or the legal log confirmed the confidential mail to Warden Paramo." (Green Decl. ¶ 30.) On August 11, 2016, Plaintiff submitted a separate 602 appeal, RJD-16-3530, in regards to a separate issue. (Green Decl. ¶ 31.) On August 30, 2016, after not receiving any inmate appeals notice regarding the July 28, 2016 and August 11, 2016 confidential mail submissions, Plaintiff wrote a letter to Warden Paramo describing the two 602s and a possible compromised mail system. (Green Decl. ¶ 32.) On September 25, 2016, Plaintiff submitted 602 appeal # RJD-16-04433 with regard to the two 602s mailed confidentially to Warden Paramo which had not been introduced into the inmate

38

appeals system. (Green Decl. ¶ 33; <u>see</u> Doc. 80, at 68, 70.) On October 26, 2016, RJ Donovan officials rejected this "appeal" because he had to use the CDCR 22 process to inquire about appeals. (Green Decl. ¶ 34.) At the second level of review, the warden responded that there was no record of an appeal regarding the refusal of access to healthcare at the RJD Inmate Appeals Office. (Doc. 80, at 84.) The third level of review found the same. (Doc. 80, at 86.) On February 4, 2017, Plaintiff wrote to the Office of the Inspector General (OIG) about the missing July 28, 2016 appeal. (Green Decl. ¶ 37.) Ultimately, the OIG declined to intervene. (Green Decl. ¶ 37.) The OIG advised Plaintiff to resubmit his original appeals to the appeals office. (Doc. 80, at 90.) However, Plaintiff never tried to resubmit his original 602 appeal concerning the issues in this case.

Although Plaintiff declared that his "every attempt to introduce the issues of this civil action into the administrative appeals system were obstructed, obfuscated, and rebuffed by prison officials, leaving [him] with no available administrative remedy" (Green Decl. ¶ 39), Plaintiff has provided no evidence for this conclusory allegation other than the fact that Plaintiff was promptly told that his 602 appeal regarding the refusal of access to healthcare was not received by the inmate appeals office. (Doc. 80, at 84.) Although "[a] federal court may nonetheless excuse a prisoner's failure to exhaust if the prisoner takes 'reasonable and appropriate steps' to exhaust administrative remedies," <u>Ellis v. Navarro</u>, 2011 WL 845902, at *1 (N.D. Cal. March 8, 2011) (citation omitted), the Court finds that Plaintiff failed to take the "reasonable

39

and appropriate" step of resubmitting his original 602 appeal to the appeals coordinator as advised by the OIG once he learned that the 602 appeal that he tried to submit concerning the issues in this case was never received by the warden's office or the appeals office. Even if the inmate appeals' box in his housing unit was damaged, Plaintiff could have mailed the appeal to the correct location; in other words, Plaintiff has offered no evidence that RJ Donovan's administrative procedure "operates as a simple dead end" as Plaintiff was successfully able to use the mail system to file other appeals. And Plaintiff offers no allegations or confirming evidence that specific prison officials thwarted him from taking advantage of the 602 appeal process "through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1853-54. Thus, the Court cannot excuse Plaintiff's failure to comply with the prison's procedural rules on exhaustion. The Court concludes that because Plaintiff failed to exhaust, the proper remedy is dismissal without prejudice of Plaintiff's entire Complaint as it is barred by § 1997e(a). Jones v. Bock, 549 U.S. 199, 223-24 (2007).

VI. CONCLUSION

For the aforementioned reasons, the Court recommends the following:

1) that Defendants' summary judgment motion be granted as to Plaintiff's Eighth Amendment claim against Defendant Solis;

2) that Defendants' summary judgment motion be denied as to Plaintiff's Eighth Amendment claims against Defendants Thiessen and Lopez; and

40

3) that Defendants' summary judgment motion be granted on exhaustion grounds as to all claims and all Defendants in Plaintiff's Complaint.

The Court submits this Report and Recommendation to United States District Judge John A. Houston under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **March 19, 2019**. The document should be captioned "Objections to Report and Recommendation." The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATE: February 19, 2019

HON. RUTH BERMUDEZ MONTENEGRO
U.S. MAGISTRATE JUDGE

41